# No. 23-10066-C

# In the United States Court of Appeals for the Eleventh Circuit

———————

## UNITED STATES OF AMERICA,
### *Plaintiff-Appellee,*

## v.

## ALEX NAIN SAAB MORAN,
### *Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
NO. 19-CR-20450 (HON. ROBERT N. SCOLA, JR.)

———————

## ANSWERING BRIEF FOR THE UNITED STATES

———————

MICHAEL DAVIS*
  First Assistant United States Attorney
  Southern District of Florida

ALEXANDER J. KRAMER
  Assistant Chief
  Fraud Section, Criminal Division

*Attorney for the United States, Acting under
Authority Conferred by 28 U.S.C. § 515

NICOLE M. ARGENTIERI
  Acting Assistant Attorney General

LISA H. MILLER
  Deputy Assistant Attorney General

JEREMY R. SANDERS
  Appellate Counsel
  Fraud Section, Criminal Division
  U.S. Department of Justice
  1400 New York Avenue, N.W.
  Washington, DC 20005
  (202) 616-2650
  jeremy.sanders@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

*United States v. Alex Nain Saab Moran,* No. 23-10066-C

In compliance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-3, the United States, through undersigned counsel, hereby certifies that the following persons and entities may have an interest in the outcome of this case:

Argentieri, Nicole M.

Barr, Jonathan R.

Casey, Lee

Comisión de Administración de Divisas (Commission for the Administration of Currency Exchange)

Davis, Michael

Gonzalez, Juan Antonio

Guardia Nacional Bolivariana de Venezuela (Bolivarian National Guard of Venezuela)

Keown, Lindy K.

Kramer, Alexander J.

Lunkenheimer, Kurt K.

Miller, Lisa H.

McQuaid, Nicolas L.

Miranda, Annika M.

New, Jonathan

Polite, Kenneth A.

Raile, Richard B.

Rivkin Jr., David B.

Romano, John-Alex

Saab Moran, Alex Nain

Sanders, Jeremy R.

Scola, Jr., Hon. Robert N., United States District Court Judge

Servicio Nacional Intergrado de Administración Aduanera y Tributaria
(National Integrated Service for the Administration of Customs Duties and
Taxes)

Sombuntham, Nalina

Vargas, Alvero Pulido

Wangsgard, Kendall

The United States is not aware of any publicly-traded company or corporation

with an interest in the outcome of this case or appeal.


In compliance with Fed. R. App. P. 26.1(b), the Government's position is that

there are no statutory victims of the offenses alleged in the indictment.

/s/ *Jeremy R. Sanders*
Jeremy R. Sanders
Appellate Counsel
Fraud Section, Criminal Division
U.S. Department of Justice

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose Defendant-Appellant Alex Nain Saab Moran's request for oral argument.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................................... i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ............................................................................ iv

JURISDICTIONAL STATEMENT ...................................................................... 1

STATEMENT OF THE ISSUE .......................................................................... 2

STATEMENT OF THE CASE ........................................................................... 2

    I.     Statement of Facts ......................................................................... 2

    II.    Initial Proceedings in the District Court ....................................... 3

    III.   Saab's First Appeal (No. 21-11083) .............................................. 6

    IV.   Proceedings in the District Court on Remand ............................... 9

    V.    The Current Appeal ...................................................................... 9

    VI.   Standard of Review ..................................................................... 10

SUMMARY OF ARGUMENT .......................................................................... 10

ARGUMENT ............................................................................................... 11

    I.     This Court Should Defer to the State Department's Certification
         that It Is Not Aware of a Basis for Saab to Enjoy Immunity in the
         United States. .............................................................................. 11

         A.    The State Department has provided a certification that it is
                not aware of a basis for Saab to assert diplomatic immunity
                in this country .................................................................... 11

         B.    Certifications from the State Department are conclusive on
                matters of diplomatic immunity ....................................... 12

II.    The District Court Did Not Clearly Err When It Determined that Saab Was Not Traveling as a "Special Envoy" at the Time of His Detention in Cabo Verde. ........................................................................... 15

III.    Even If Saab Were Traveling as a "Special Envoy," He Is Not Entitled To Diplomatic Immunity Because He Purported to Represent a Government Not Recognized by the United States. ........... 18

    A.    The United States does not recognize the Maduro regime as the government of Venezuela. ........................................................ 18

    B.    Representatives of the Maduro regime are not entitled to diplomatic immunity in the United States. ..................................... 20

IV.    Saab Does Not Enjoy Immunity Under the Vienna Convention. .......... 22

    A.    The Diplomatic Relations Act and the Vienna Convention. ....... 22

    B.    Because the Vienna Convention applies only to representatives of permanent missions, Saab is not entitled to immunity under the Convention. ................................................. 24

V.    Saab Does Not Enjoy Transit Immunity Under Customary International Law. ........................................................................... 26

    A.    The transit immunity provisions of the Convention on Special Missions do not reflect customary international law ........ 27

    B.    Because Cabo Verde did not consent to Saab's transit, Saab is not entitled to transit immunity under customary international law. ................................................................................ 29

CONCLUSION ................................................................................................ 33

CERTIFICATE OF COMPLIANCE ............................................................ 34

# TABLE OF AUTHORITIES

## Cases

*Abdulaziz v. Metro. Dade Cty.*,
   741 F.2d 1328 (11th Cir. 1984) ................................................................. *passim*

*Ali v. Dist. Dir., Miami Dist., U.S. Citizenship & Immigr. Servs.*,
   43 F. App'x 354 (11th Cir. 2018) ....................................................10, 12, 15

*Anderson v. City of Bessemer City*,
   470 U.S. 564 (1985) ................................................................................ 16

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................................ 13

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ................................................................................ 32

*Bergman v. De Sieyes*,
   170 F.2d 360 (2d Cir. 1948) .................................................................... 29

*Flores v. S. Peru Copper Corp.*,
   414 F.3d 233 (2d Cir. 2003) ................................................................27-28

*In re Baiz*,
   135 U.S. 403 (1890) ................................................................................ 13

*Mamani v. Sanchez Bustamante*,
   968 F.3d 1216 (11th Cir. 2020) .............................................................. 27

*Muthana v. Pompeo*,
   985 F.3d 893 (D.C. Cir. 2021) ................................................................ 13

*PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*,
   65 F.4th 556 (11th Cir. 2023) ...........................................................18, 19, 20

*Powell v. Allen*,
   602 F.3d 1263 (11th Cir. 2010) .............................................................. 10

*Republic of Mexico v. Hoffman*,
   324 U.S. 30 (1945) .................................................................................. 13

*Tabion v. Mufti,*
　73 F.3d 535 (4th Cir. 1996) ............................................................. 23

*United States v. Al-Hamdi,*
　356 F.3d 564 (4th Cir. 2004) ............................................... 10, 13-14

*United States v. Bahel,*
　662 F.3d 610 (2d Cir. 2011) ............................................................ 24

*United States v. Bellaizac-Hurtado,*
　700 F.3d 1245 (11th Cir. 2012) ...................................................... 27

*United States v. Grushko,*
　50 F.4th 1 (11th Cir. 2022) .........................................................15-16

*United States v. Khobragade,*
　15 F. Supp. 3d 383 (S.D.N.Y. 2014) ............................................... 13

*United States v. Knowles,*
　390 F. App'x 915 (11th Cir. 2010) .............................................32-33

*United States v. Lumumba,*
　741 F.2d 12 (2d Cir. 1984) .....................................................12, 20, 21

*United States v. Macias,*
　654 F. App'x 458 (11th Cir. 2016) ................................................. 27

*United States v. Ramirez-Chilel,*
　289 F.3d 744 (11th Cir. 202) ......................................................... 15

*United States v. Saab Moran,*
　No. 21-11083, 2022 WL 1297807 (11th Cir. May 2, 2022) ...................1, 8-9

*United States v. Sissoko,*
　995 F. Supp. 1469 (S.D. Fla. 1997) ..........................................25, 29

*Weixum v. Xilai,*
　568 F. Supp. 2d 35 (D.D.C. 2008) ...........................................13, 29

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
　566 U.S. 189 (2012) ..................................................... 14, 19, 20, 22

## Constitutional Provisions, Federal Statutes & Rules

18 U.S.C. § 2 ..................................................................................... 2

18 U.S.C. § 1956 ........................................................................... 2, 8

18 U.S.C. § 3231 ............................................................................... 1

22 U.S.C. § 254a ............................................................................ 22

22 U.S.C. § 254d ............................................................................ 22

Fed. R. App. P. 4 ............................................................................. 1

U.S. Const. art. II, § 3 ................................................................... 19

## Other Authorities

Exec. Order No. 13,857, 84 Fed. Reg. 509 (Jan. 25, 2019) ............................................. 19

1 J. Moore, Digest of International Law (1906) ............................................. 20

Press Statement, Heather Nauert, Dep't Spokesperson, U.S. Dep't of State (Aug. 18, 2017) ...................................................................................... 18

Restatement (Second) of The Foreign Relations Law of the United States .................................................................. 20, 21, 29-30

Restatement (Third) of The Foreign Relations Law of the United States ........ 19, 20, 27

United Nations Convention on Special Missions, Dec. 8, 1969, 1400 U.N.T.S. 231 ....................................................................... 26, 28, 30

U.S. Department of State, U.S. Recognition of Venezuela's 2015 National Assembly and Interim President Guaido ........................................... 18-19

Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 ...................................................... 22, 23, 24

## JURISDICTIONAL STATEMENT

Defendant-Appellant Alex Nain Saab Moran ("Saab") seeks interlocutory review of an order of the district court (Scola, J.) denying his motion to dismiss the indictment on the grounds that he is a diplomat and thus immune from prosecution in the United States. The district court, which had jurisdiction under 18 U.S.C. § 3231, entered its order denying Saab's motion on December 23, 2022, DE 197,[1] and Saab filed a timely notice of appeal on December 28, 2022, DE 200. *See* Fed. R. App. P. 4(b). As set forth more fully in the Government's February 23, 2023 response to this Court's jurisdictional question, the Government acknowledges that this Court's opinion in Saab's first interlocutory appeal, *United States v. Saab Moran*, No. 21-11083, 2022 WL 1297807 (11th Cir. May 2, 2022), necessarily concluded that the denial of a motion to dismiss based on diplomatic immunity is immediately appealable under the collateral order doctrine. Because that ruling is law of the case, this Court has jurisdiction over this interlocutory appeal.[2]

---

[1] "DE" refers to the district court docket entries and, where appropriate, is followed by the relevant page number as indicated on the ECF header; "Gov't Ex." refers to the Government's exhibits submitted at the evidentiary hearing held on December 12-13, 2022; "Br." refers to Saab's opening brief in this appeal; "First Appeal Br.", "Gov't First Appeal Br." and "First Appeal Reply" refer to the briefing in Saab's previous appeal, No. 21-11083.

[2] A motions panel of this Court subsequently issued an order noting probable jurisdiction over this appeal, although reserving for the merits panel the "final decision regarding jurisdiction."

## STATEMENT OF THE ISSUE

Whether Saab is entitled to diplomatic immunity from prosecution in the United States based on his alleged status as a "special envoy" of the Maduro regime.

## STATEMENT OF THE CASE

Saab is charged in the United States District Court for the Southern District of Florida with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  DE 1 at 1-9.  Saab moved to dismiss the indictment, claiming that he was traveling as a "special envoy" of the Government of Venezuela at the time of his arrest, and therefore entitled to diplomatic immunity.  Following an evidentiary hearing, the district court denied Saab's motion in a written order.  This interlocutory appeal follows.

### I.    Statement of Facts

On July 25, 2019, a grand jury sitting in the Southern District of Florida returned an indictment charging Saab and his co-defendant, Alvaro Pulido Vargas ("Pulido"), with various money laundering offenses in connection with a scheme to launder bribe payments made to Venezuelan government officials.  DE 1.  Specifically, Saab was initially charged with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count One); and seven counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2 (Counts Two through Eight).  DE 1 at 3-9.

In brief, the indictment alleges that Saab and Pulido engaged in a fraudulent scheme whereby they and their co-conspirators made unlawful payments to Venezuelan government officials to obtain improper business advantages, including governmental

2

approval of false and fraudulent documents related to the importation of construction goods and materials and access to Venezuela's government-controlled foreign currency exchange system. DE 1 at 4-5; DE 46 at 1. The indictment alleges, in part, that in or around November 2011, Saab and Pulido, through a company they owned and controlled, entered into a contract with the government of Venezuela to build low-income housing units. DE 1 at 5; DE 46 at 1. Saab and his co-conspirators then made numerous corrupt payments, by cash and wire transfer, to Venezuelan government officials in exchange for their assistance in approving false and fraudulent invoices and documents for goods that were never provided. DE 1 at 6; DE 46 at 1. As a result of these corrupt payments, Saab and his co-conspirators received payments on the false and fraudulent invoices from the Venezuelan government and gained access to Venezuela's government-controlled foreign currency exchange system, which they used to ensure that those payments were made in U.S. dollars. DE 1 at 3, 6-7; DE 46 at 1. The defendants then furthered the corrupt scheme through a series of wire transfers to bank accounts located in the Southern District of Florida. DE 1 at 7-9; DE 46 at 1.

## II.    Initial Proceedings in the District Court

On August 27, 2019, approximately one month after the indictment was returned, the district court entered an order transferring both defendants to "fugitive status" because neither had made an initial appearance before that court. DE 5. On June 12, 2020, Saab was detained in the Republic of Cabo Verde, an archipelago nation west of continental Africa, pursuant to an INTERPOL Red Notice requested by the

3

United States.  DE 46 at 2.  The United States thereafter submitted a formal extradition request, which Saab opposed.  *Id.*  On July 31, 2020, a Cabo Verdean court approved the extradition of Saab to the United States.  Saab appealed that decision within the Cabo Verdean judicial system.  *Id.*

On January 21, 2021, Saab, through counsel and without having made an initial appearance before the district court, filed a motion to vacate the district court's previous order conferring fugitive status on him and for leave to file a motion to dismiss the indictment.  DE 10.  Saab contested that he was a fugitive on the basis that he was not present in the United States "at any time relevant to the indictment" and thus "did not *flee* this Court's jurisdiction."  DE 10 at 1, 8 (emphasis in original).  Saab further asserted that he had "'fundamental' challenges to the indictment that should be resolved as a predicate to extradition," specifically that the district court lacked subject-matter jurisdiction because he purportedly was entitled to absolute immunity from prosecution as a "special envoy" of Venezuela and that "the statutes at issue do not purport to reach [his] wholly extraterritorial conduct."  *Id.* at 1-2, 8-9.  Saab requested that the district court "vacate its order conferring fugitive status . . . and/or grant [him] leave to specially appear to move to dismiss the indictment."  *Id.* at 2.  Appended to Saab's motion was a proposed motion to dismiss the indictment on various grounds, among them that Saab was entitled to diplomatic immunity.  DE 10-8.

The Government filed a response to Saab's motion in which it argued, *inter alia*, that the court should deny the motion "without prejudice to renewal" when Saab

appeared in the district court to answer the charges against him.  DE 24 at 20-21.  The Government urged the district court to apply the long-established fugitive disentitlement doctrine, a discretionary tool repeatedly employed by the courts to limit a fugitive's access to the courts when he is only willing to submit his case for adjudication to achieve a favorable outcome.   DE 24 at 8-15.   Although the Government did not address the merits of Saab's motion to dismiss in detail in its response, it did contest Saab's claim that he was entitled to immunity, appending to its response a letter from the United States Department of State explaining that the "Office of Foreign Missions is not aware of a basis for [Saab] to enjoy immunity from the criminal or civil jurisdiction of the United States."  DE 24 at 15-18; DE 24-3.

The district court denied Saab's motion to vacate the order conferring fugitive status and for leave to make a special appearance to challenge the indictment, concluding that Saab was "precluded from attacking his fugitive status and indictment until he is physically present in this jurisdiction." DE 46 at 5.  The district court found that Saab was a fugitive under the doctrine of constructive flight because "he has been aware of the charges against him for almost two years and has had ample opportunity to present himself to United States authorities" but had declined to do so.  DE 46 at 3. The district court also rejected Saab's argument that his "fundamental" challenges to indictment, including his "forthcoming" diplomatic immunity argument, precluded application of the fugitive disentitlement doctrine.  DE 46 at 5.  The court explained that "if Saab Moran wishes to raise 'fundamental' challenges to the indictment, he may

physically appear in this district as the Government has repeatedly requested." DE 46 at 4.

### III.   Saab's First Appeal (No. 21-11083)

Saab filed a timely notice of appeal. DE 47. In his opening brief, Saab argued that this Court had jurisdiction over his appeal pursuant to the collateral order doctrine. Saab First Appeal Br. at 10-16.[3] On the merits, Saab argued that the district court erred in classifying him as a fugitive because "he cannot reasonably [be] said to have fled the district court's jurisdiction," *id.* 27, and, even if he were properly considered a fugitive, the district court erred in applying the fugitive disentitlement doctrine to his case, *id.* 30-32. Saab also argued that this Court should find that he is entitled to immunity from prosecution, even though the district court expressly did not consider the issue below. *Id.* 32-47.

In its answering brief, the Government maintained that this Court lacked jurisdiction because an order denying a motion to dismiss on fugitive disentitlement grounds is not appealable on an interlocutory basis. Gov't First Appeal Br. at 10-21. In the event this Court held that it had jurisdiction, the Government argued that this Court's precedent supported the district court's finding that Saab qualified as a fugitive

---

[3] Before Saab filed his opening brief, this Court requested that the parties file simultaneous submissions addressing the question of whether this Court had jurisdiction to entertain Saab's appeal on an interlocutory basis. After the parties filed their respective responses, a motions panel of this Court ordered the jurisdictional issue to be carried with the case and submitted to the merits panel for resolution.

and that the district court did not abuse its substantial discretion in declining to rule on Saab's motion to dismiss until he submitted to the jurisdiction of the court. *Id.* 23-32. With respect to Saab's substantive claim of immunity, the Government principally argued that this Court should decline to address the issue in the first instance but, in the event it chose to do so, it should reject Saab's claim because the United States Department of State does not recognize Saab as enjoying any immunity and its determination in such matters is conclusive. *Id.* 32-40.[4]

While Saab's appeal was ongoing, the Cabo Verdean Supreme Court affirmed Saab's extradition order and, thereafter, the Cabo Verde Constitutional Court, that nation's court of last resort, issued a 194-page ruling denying Saab's constitutional appeal. DE 193-2 & DE 193-3 (Gov't Ex. 2); Ruling No. 39/2021. Saab subsequently filed a motion for reconsideration and a motion to nullify the court's decision, both of which were denied. On October 13, 2021, the Constitutional Court issued a certificate of final judgment. Three days later, Saab was extradited from Cabo Verde and arrived in the United States. Saab made his initial appearance in the United States District

---

[4] Because it was not the basis of the district court's order on appeal, the Government argued in its brief that this Court need not decide the question of whether the denial of a motion to dismiss an indictment on the basis of diplomatic immunity would be immediately appealable. Gov't First Appeal Br. at 16-17.

Court for the Southern District of Florida on October 18, 2021. DE 58. At his subsequent arraignment on November 15, 2021, Saab pleaded not guilty. DE 71.[5]

After Saab's extradition, the Government moved to dismiss appeal No. 21-11083 on the grounds that Saab's extradition had rendered the merits of the district court's fugitive disentitlement ruling moot. *Saab Moran*, 2022 WL 1297807 at *3 n.2. For his part, in his reply brief, Saab conceded that the fugitive disentitlement doctrine was "no longer implicated" in the appeal, First Appeal Reply Br. at 6-7, but urged this Court to rule on Saab's underlying claim that he is a diplomat entitled to immunity, *id.* at 8-23.

This Court vacated the district court's fugitive disentitlement ruling and remanded for further proceedings. *Saab Moran*, 2022 WL 1297807 at *2. At the outset, the Court rejected the Government's jurisdictional challenge, holding that it "had jurisdiction to review the district court's order because the district court declined to rule on the issue of diplomatic immunity." *Id.* at *2 n.1. The Court "agree[d] with the parties" that the fugitive disentitlement issue was moot and "vacate[d] the district court's order addressing it." *Id.* at *2. The Court declined to address Saab's immunity

---

[5] Pursuant to assurances made by the United States to the Republic of Cabo Verde during Saab's extradition process that the United States would prosecute Saab for only one count in the indictment "in order to comply with Cabo Verdean law regarding the maximum term of imprisonment," on November 1, 2021, the Government filed a motion to dismiss Counts Two through Eight as to Saab only. DE 63. The district court granted that motion the same day. DE 64. Thus, the only charge currently pending against Saab is Count One, charging conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

claim, observing that "the parties did not have the opportunity to fully develop the record" and "the district court did not have the opportunity to weigh the evidence" with respect to that claim. *Id.* Accordingly, the Court remanded "the case to the district court to consider in the first instance whether Saab Moran is a foreign diplomat and immune from prosecution." *Id.*

## IV.    Proceedings in the District Court on Remand

On October 17, 2022, Saab filed a motion to dismiss the indictment on the grounds that he is entitled to diplomatic immunity from prosecution. DE 147. Following an evidentiary hearing in which the parties presented witnesses and documentary evidence, DE 183 & DE 184, the district court denied the motion in a written order dated December 23, 2022, DE 197.

## V.    The Current Appeal

Saab filed a timely notice of appeal. DE 200. On January 26, 2023, following the issuance of a briefing schedule, this Court requested that the parties file simultaneous submissions addressing "whether the district court's order denying Appellant's motion to dismiss the indictment based on diplomatic immunity is final or immediately appealable." Both parties filed responses contending that this Court had jurisdiction to consider the merits of the diplomatic immunity question on an interlocutory basis. A motions panel of this Court issued an order on June 13, 2023, noting probable jurisdiction over this appeal, although reserving for the merits panel the "final determination regarding jurisdiction."

9

## VI.    Standard of Review

"The determination of whether a person is a foreign diplomatic officer 'is a mixed question of fact and law.'"  *Ali v. Dist. Dir., Miami Dist., U.S. Citizenship & Immigr. Servs.*, 743 F. App'x 354, 358 (11th Cir. 2018) (per curiam) (quoting *United States v. Al-Hamdi*, 356 F.3d 564, 569 (4th Cir. 2004)).   This Court reviews a district court's "conclusions on legal questions and mixed questions of law and fact *de novo* and its factual findings for clear error."  *Powell v. Allen*, 602 F.3d 1263, 1268 (11th Cir. 2010) (per curiam).

## SUMMARY OF ARGUMENT

There are four independent reasons this Court should affirm the district court's conclusion that Saab is not entitled to diplomatic immunity in this country.  *First*, the U.S. State Department has certified it is "not aware of a basis for Alex Nain Saab Moran to enjoy immunity from the criminal or civil jurisdiction of the United States."  Because the views of the State Department are conclusive on matters of diplomatic immunity, Saab's claim necessarily fails.  *Second*, the district court did not clearly err in finding, based on its review of the record as a whole, that Saab "truly was no diplomat at all."  DE 197 at 7.  *Third*, because, at best, Saab was traveling as a "special envoy" of a government not recognized by the United States, he is not entitled to immunity in this country.  *Finally*, should this Court reach the merits of Saab's claim of immunity under either the Vienna Convention or customary international law, it should affirm the district court's determination that he has no valid claim of immunity under either regime

because, at most, he was in transit on special mission without the consent of the transiting state.

## ARGUMENT

### I.   This Court Should Defer to the State Department's Certification that It Is Not Aware of a Basis for Saab to Enjoy Immunity in the United States.

In denying Saab's motion to dismiss, the district court recognized that the record contained a certification from the U.S. State Department through its Office of Foreign Missions which stated that it was "not aware of a basis for Alex Nain Saab Moran to enjoy immunity from the criminal or civil jurisdiction of the United States." *See* DE 197 at 13; *see also* DE 24-3; DE 153-5; DE 193-10 (Gov't Ex. 9).[6]  As explained below, "courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status," *Abdulaziz v. Metro. Dade Cnty.*, 741 F.2d 1328, 1331 (11th Cir. 1984); this Court should do the same and affirm on this ground.

### A.   The State Department has provided a certification that it is not aware of a basis for Saab to assert diplomatic immunity in this country.

In litigating Saab's claim of diplomatic immunity below, the Government provided the district court with a submission from the United States Department of State that explained that Saab "has never been notified to the Department of State as a member of any foreign mission in the United States, including [the] Venezuelan bilateral

---

[6] The record contains multiple identical copies of the State Department certification; for ease of reference, the Government will cite to the version introduced at the evidentiary hearing. *See* DE 193-10 (Gov't Ex. 9).

mission," "is not currently nor ever has been notified as a member of the Delegation of the African Union Mission at Washington, [D.C.]," and "is not currently nor ever has been notified as a member of the Office of the Permanent Observer for the African Union to the United Nations." DE 193-10 at 2 (Gov't Ex. 9). Accordingly, the document concluded that "the Office of Foreign Missions is not aware of a basis for [Saab] to enjoy immunity from the criminal or civil jurisdiction of the United States." *Id.* In its opposition to Saab's motion to dismiss and at oral argument on the motion, the Government argued that the State Department's views on the matter should be conclusive. DE 153 at 18-20; DE 212 at 52-53. In its order denying Saab's motion to dismiss, the district court relied on the State Department's certification as one of several reasons why Saab was not entitled to diplomatic immunity. DE 197 at 13.

      B. <u>Certifications from the State Department are conclusive on matters of diplomatic immunity.</u>

Saab, like any criminal defendant, cannot "unilaterally . . . assert diplomatic immunity." *United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984). "In the United States in particular, a person's diplomatic status is established when it is recognized by the Department of State." *Ali*, 743 F. App'x at 358 (citations and internal quotation marks omitted). Indeed, as this Court has recognized, "courts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status." *Abdulaziz*, 741 F.2d at 1331. The courts have long understood that the Executive Branch's authority to make foreign immunity determinations, and the requirement of

12

judicial deference to such determinations, follows from the President's constitutional responsibility for conducting the nation's foreign relations. *See* Part III.A, *infra*; *see also, e.g.*, *Baker v. Carr*, 369 U.S. 186, 213 (1962) ("[I]t is the executive that determines a person's status as representative of a foreign government."); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) (recognizing in sovereign immunity case that it is "not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize"); *Muthana v. Pompeo*, 985 F.3d 893, 907 (D.C. Cir. 2021) ("Recognizing the vesting of these diplomatic powers with the President, courts have afforded conclusive weight to the Executive's determination of an individual's diplomatic status."), *cert. denied*, 142 S.Ct. 757 (2022).

Accordingly, the Supreme Court has held that when it comes to questions of diplomatic immunity, the "certificate of the Secretary of State . . . is the best evidence to prove the diplomatic character of a person." *In re Baiz*, 135 U.S. 403, 421 (1890). In other words, "[i]n proceedings where a person's diplomatic status is contested, courts generally consider the State Department's determination to be conclusive." *United States v. Khobragade*, 15 F. Supp. 3d 383, 385 (S.D.N.Y. 2014); *see also Weixum v. Xilai*, 568 F. Supp. 2d 35, 37 (D.D.C. 2008) (holding that deference to the Executive's suggestion of immunity is "equally applicable to a foreign minister who is part of a special diplomatic mission"). For example, in considering the appeal of a criminal defendant who asserted a claim of diplomatic immunity, the Fourth Circuit declined to "review the State

Department's factual determination that, at the time of his arrest, [the defendant] fell outside the immunities of the Vienna Convention," and held that the certification was "conclusive evidence as to the diplomatic status of an individual." *Al-Hamdi*, 356 F.3d at 573. The Fourth Circuit noted that "it appears that no reviewing court has ever held that the State Department's certification is anything but conclusive." *Id.* at 572.

Saab asserts that "the State Department's views 'as to the fact of diplomatic status' are irrelevant" because Saab "does not allege he was accredited to or received by the United States." Br. at 59 (quoting *Abdulaziz*, 741 F.2d at 1331). But the need for deference to the State Department's determination of diplomatic immunity is not limited to cases in which the individual in question is accredited to the United States. Indeed, such deference is necessary to ensure that the country speaks with one voice on matters of foreign policy, *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015), and that holds true regardless of the basis an individual is asserting for his purported diplomatic immunity.[7] Accordingly, the certification of the State Department forecloses Saab's diplomatic immunity claim in this case.

---

[7] Saab also briefly argues that the State Department's document here is "too ambiguous to command deference." Br. at 59-60. But there is nothing equivocal about the statement that "the Office of Foreign Missions is not aware of a basis for [Saab] to enjoy immunity from the criminal or civil jurisdiction of the United States." DE 193-10 at 2 (Gov't Ex. 9); *see also* DE 197 at 13 (district court stating that "the State Department has certified *in no uncertain terms* that it is aware of no 'basis for Alex Nain Saab Moran to enjoy immunity from the criminal or civil jurisdiction of the United States.'" (emphasis added)).

**II.    The District Court Did Not Clearly Err When It Determined that Saab Was Not Traveling as a "Special Envoy" at the Time of His Detention in Cabo Verde.**

In its order denying Saab's motion to dismiss, the district court made detailed findings of fact and concluded, as a factual matter, "that the Maduro regime has, in a post hoc manner, done its best to imprint upon Saab Moran a diplomatic status that he did not factually possess" on the date he was detained in Cabo Verde. DE 197 at 6. Specifically, the court held that the evidence before it "suggests that the Maduro regime and its accomplices have fabricated documents to cloak Saab Moran in a diplomatic dress that does not befit him, all in an effort to exploit the law of diplomatic immunities and prevent his extradition to the United States." *Id.* Accordingly, it found that Saab "truly was no diplomat at all." *Id.* at 7. On appeal, Saab has not shown that this factual finding is clearly erroneous and, therefore, this Court should affirm.

As this court has explained, "[t]he determination of whether a person is a foreign diplomatic officer 'is a mixed question of fact and law.'" *Ali*, 743 F. App'x at 358. The district court set forth detailed factual findings concerning the credibility and legitimacy of the evidence in the record before it as to Saab's claim of diplomatic immunity. DE 197 at 2-7. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). Accordingly, this Court "afford[s] substantial deference to the fact finder's explicit and implicit credibility determinations." *United*

15

*States v. Grushko*, 50 F.4th 1, 11 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 2594 (2023), *and cert. denied*, 143 S. Ct. 2680 (2023).  Furthermore, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).  And this same rule applies "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.* at 574.

Specifically, the district court found that Saab's theories of diplomatic immunity simply were not credible in light of the "the sum of evidentiary inconsistencies and indications of documentary manipulation" evinced throughout the two-day evidentiary hearing.  DE 197 at 6.  For example, the district court determined that "the Maduro regime doctored certain documents to make it appear that Saab Moran was traveling to Iran as a 'special envoy' when he was arrested," *id.* at 5, a determination based on its factual findings concerning various versions of the Venezuelan government's official gazette, one of which purportedly published a resolution naming Saab as a "special envoy."  As the district court explained:

> According to a copy of the gazette that was obtained from the Venezuelan *Imprenta Nacional*, the resolution was included in the gazette's publication on April 26, 2018.  However, the Government offered a copy of the April

26, 2018 gazette that was retained by the U.S. Library of Congress, and yet another copy of the same gazette as published on the Venezuelan Supreme Court's website. Identical in the relevant respects, neither of these two copies reflects the purported resolution announcing Saab Moran as a special envoy. Samuel Marple, an FBI computer scientist, testified that the version that does include the announcement—i.e., the one obtained from the Venezuelan *Imprenta Nacional*—showed traces of post-publication modifications whereas the other two versions did not.

*Id.* at 5 (citations omitted); *see also* DE 193-18, 193-19, 193-20, & 193-21 (Gov't Exs. 17, 17A, 18, & 19).

Saab criticizes the district court for failing to review the record "in its entirety." Br. at 26-31. But the district court's factual findings reflect a conclusion that the record, as a whole, did not support Saab's claim of "special envoy" status. As another example, the district court rejected Saab's reliance on other documents purporting to establish his diplomatic immunity as unsuccessful efforts by "the Maduro regime [] to devise ways of avoiding his extradition to the United States by exploiting the law of diplomatic immunities." *Id.* at 3; *see, e.g., id.* at 3-4 (rejecting as not credible Saab's "sudden naming in December 2020" to the African Union); *id.* at 4-5 (rejecting Saab's reliance on his diplomatic passport). These additional credibility determinations, which are entitled to deference, reflect that the district court did indeed read the record "in its entirety" and wholly disbelieved Saab's claim of diplomatic immunity.

**III.    Even If Saab Were Traveling as a "Special Envoy," He Is Not Entitled To Diplomatic Immunity Because He Purported to Represent a Government Not Recognized by the United States.**

In addition to making the factual determination that Saab "truly was no diplomat at all," DE 197 at 7, the district court concluded, as a matter of law, that even if Saab was in fact serving as a "special envoy," that status did not entitle him to diplomatic immunity in the United States. Specifically, the district court reasoned that because the United States does not recognize the regime of Nicolás Maduro as the government of Venezuela, Saab's claim of diplomatic immunity, premised on an assertion that he is a representative of the Maduro regime, must fail. *Id.* at 7-8. That legal conclusion is sufficient standing alone to warrant affirmance.

A.    The United States does not recognize the Maduro regime as the government of Venezuela.

Saab's claim of diplomatic immunity rests on the disputed premise that he was accredited as a "special envoy" to Iran by the Nicolás Maduro regime. However, as this Court recently recognized, "[t]he United States ceased to recognize the government of Nicolás Maduro, who purports to serve as president of Venezuela, in August 2017." *PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*, 65 F.4th 556, 561 (11th Cir. 2023) (citing Press Statement, Heather Nauert, Dep't Spokesperson, U.S. Dep't of State (Aug. 18, 2017)). Rather, "[t]he United States continues to recognize the authority of the democratically elected 2015 National Assembly as the last remaining democratic institution" in Venezuela. *See* U.S. Department of State, U.S. Recognition of

18

Venezuela's 2015 National Assembly and Interim President Guaido, https://www.state.gov/u-s-recognition-of-venezuelas-2015-national-assembly-and-interim-president-guaido (Jan. 4, 2022); *see also* Exec. Order No. 13,857, 84 Fed. Reg. 509 (Jan. 25, 2019) (recognizing the National Assembly as "the only legitimate branch of government duly elected by the Venezuelan People").[8]

"The text and structure of the Constitution grant the President the power to recognize foreign nations and governments." *Zivotofsky*, 576 U.S. at 14; *see also* Restatement (Third) of The Foreign Relations Law of the United States § 204 ("Under the Constitution of the United States the President has exclusive authority to recognize or not to recognize a foreign state or government and to maintain or not to maintain diplomatic relations with a foreign government."). This long-recognized "power to recognize other nations," the Supreme Court has explained, "is a logical and proper inference," *Zivotofsky*, 576 U.S. at 12, stemming from the powers vested in the President by Article II of the Constitution, chief among them the Reception Clause, which provides that the President "shall receive Ambassadors and other public Ministers," U.S. Const. Art. II, § 3. The Court also explained that entrusting the power to recognize foreign nations and governments to the President alone is a practical necessity because

---

[8] The United States previously recognized the former president of the 2015 General Assembly, Juan Guaidó, as interim president of Venezuela, "until the Assembly recently voted to remove him and replace his interim government with a committee." *PDVSA US Litig. Tr.*, 65 F.4th at 561.

the United States "must have a single policy regarding which governments are legitimate in the eyes of the United States and which are not." *Zivotofsky*, 576 U.S. at 14. And— dispositive for purposes of this appeal—"[t]he executive branch has given no indication that it will change its longstanding position that the Maduro government is illegitimate." *PDVSA US Litig. Tr.*, 65 F.4th at 561.

B. <u>Representatives of the Maduro regime are not entitled to diplomatic immunity in the United States.</u>

Because the United States does not recognize the Maduro regime, it follows that Saab, who purports to be a representative of that regime, is not entitled to diplomatic immunity in this country. Recognition is a "formal acknowledgement" . . . "that a particular regime is the effective government of a state" and "[r]ecognition at international law . . . is a precondition of regular diplomatic relations." *Zivotofsky*, 576 U.S. at 11 (quoting Restatement (Third) of The Foreign Relations Law of the United States § 203, cmt. a and 1 J. Moore, Digest of International Law § 27, p. 72 (1906)). As a result, diplomatic immunity of a foreign State's diplomats "only exists when there is recognition of another state's sovereignty by the Department of State," *Lumumba*, 741 F.2d at 15, a conclusion which extends also to the recognition of a foreign State's government. *See also* Restatement (Second) of The Foreign Relations Law of the United States § 73 cmt. g. ("A diplomatic agent claiming to represent a revolutionary government that is not recognized by the receiving state is not entitled to diplomatic immunity in the courts of that state."). For that reason, the Second Circuit held that a

district court properly rejected a claim of immunity from a defendant who asserted that he was "Vice President and Minister of Justice of the Provisional Government of the Republic of New Afrika." *Lumumba*, 741 F.2d at 14-15. Reasoning that "recognition by the executive branch—not to be second-guessed by the judiciary—is essential to establishing diplomatic status," the Second Circuit concluded that the defendant was precluded from asserting immunity because "[t]he United States Department of State has not recognized the Republic of New Afrika or its Provisional Government . . .[and] has never granted immunity status to [the defendant.]" *Id.* at 15.

The district court correctly recognized these principles when it held that "because [Saab], at best, represented only a regime deemed illegitimate by the President, he could not have carried any cognizable diplomatic status" and thus "cannot assert any form of diplomatic immunity in this Court as a matter of law." DE 197 at 8. As the district court explained, because "Maduro's regime has been deemed 'illegitimate,'" "any claim to diplomatic immunity asserted by a representative of the Maduro regime must also be considered illegitimate." *Id.* at 7-8 (citing Restatement (Second) of The Foreign Relations Law of the United States § 73 cmt. g).[9]

Saab asserts, Br. at 53-57, that the fact that the United States does not recognize the Maduro regime is irrelevant because the only recognition that matters is that

---

[9] Saab resists this conclusion, arguing, Br. 61-62, that the United States does recognize Venezuela as a sovereign state. That is certainly correct, but it is irrelevant as the United States does not recognize the Maduro regime as the government of that state.

between the sending state, *i.e.*, Venezuela, and the receiving state, *i.e.*, Iran.  But requiring the United States to adhere to the recognition decisions of other states and governments would undermine the recognition power of the executive.  *Zivotofsky*, 576 U.S. at 14.

## IV.    Saab Does Not Enjoy Immunity Under the Vienna Convention.

Saab claims that his status as a "special envoy" of Venezuela to Iran qualifies him as a diplomatic agent entitled to immunity under the Vienna Convention and the Diplomatic Relations Act.  Br. at 31-35.  But even assuming Saab was serving as a "special envoy," a factual premise which the district court rejected and to which this Court should defer, *see* Part II, *supra*, the Vienna Convention offers Saab no privileges or immunities because it covers only permanent missions, not temporary ones.

### A.  The Diplomatic Relations Act and the Vienna Convention.

Diplomatic immunity in the United States is governed by the Diplomatic Relations Act of 1978, 22 U.S.C. §§ 254a-254e, which implements the obligations of the United States under the Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 ("Vienna Convention"), an international treaty that sets forth, *inter alia*, the privileges and immunities to be accorded to diplomatic agents and other diplomatic mission staff.  *See Abdulaziz*, 741 F.2d at 1330.  Relevant here, the Diplomatic Relations Act provides that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding . . . shall be dismissed."  22 U.S.C. § 254d.

The principal diplomatic immunity provision of the Vienna Convention is set forth in Article 31, which provides that "[a] diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State." Vienna Convention, art. 31.1. As this language makes clear, the immunities afforded under this provision of the Vienna Convention are specific to the *receiving* state. *See* Vienna Convention, art. 31.1; *see also Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996) ("The Vienna Convention provides diplomats with absolute immunity from criminal prosecution and protection from most civil and administrative actions brought in the 'receiving State,' *i.e.*, the state where they are stationed."). Thus, for purposes of this case, even if Saab's status as a special envoy guaranteed him any protections under the Convention, which as explained below it does not, at most Article 31 would guarantee him immunity from criminal prosecution in the receiving state, Iran; his purported status would not entitle him to any immunity under this provision *in the United States*.

Saab is, of course, correct that in addition to providing for immunity from civil and criminal jurisdiction in the receiving state, another provision of the Vienna Convention provides for transit immunity in third states. *See* Vienna Convention, Art. 40.1 ("If a diplomatic agent passes through or is in the territory of a third State, which has granted him a passport visa if such visa was necessary, while proceeding to take up or to return to his post, or when returning to his own country, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return."). This "transit immunity" provision provides for "inviolability" for

accredited diplomatic agents taking up or returning to their "post," or when returning to their own country. It is this transit immunity provision that Saab claims entitles him to dismissal of the charges contained in the indictment pending against him in the United States. It does not.

> B. Because the Vienna Convention applies only to representatives of permanent missions, Saab is not entitled to immunity under the Convention.

Because the transit immunity provision contained in Article 40 of the Vienna Convention provides immunity for a "diplomatic agent," the district court correctly proceeded to determine if Saab qualifies as such a "diplomatic agent" for purposes of the Diplomatic Relations Act. *See United States v. Bahel*, 662 F.3d 610, 623 (2d Cir. 2011) ("[T]he DRA applies only to diplomats, and not to other officials."). The Vienna Convention defines "diplomatic agent" as "the head of the mission or a member of the diplomatic staff of the mission." Vienna Convention, art. 1(e). And, as the district court recognized, "the [Vienna Convention's] use of the term makes clear that the types of diplomatic "missions" the [Vienna Convention] applies to are permanent representative missions, not special or temporary missions such as the one Saab Moran, at best, formed part of when arrested." DE 197 at 9. *See* Vienna Convention, art. 2 ("The establishment of diplomatic relations between States, and of permanent diplomatic missions, takes place by mutual consent."). Accordingly, the district court explained:

24

> Given this understanding of the [Vienna Convention], the Court returns to the question of whether Saab Moran may invoke the convention's protections and reiterates that the answer is no. As noted, the evidence shows that Saab Moran was, at best, traveling to perform a temporary undertaking on behalf of Maduro's regime in Iran. He was not traveling as a member or head of a permanent mission during the trip in question. Consequently, Saab Moran is not a "diplomatic agent" in the sense of the [Vienna Convention] and may not invoke any of the convention's provisions.

DE 197 at 10.

Saab contends, Br. at 35-38, that the district court's ruling "defied this Court's holding in *Abdulaziz* that a 'special envoy' is "afforded full protection pursuant to the Diplomatic Relations Act."   But the district court carefully read *Abdulaziz*, and explained why this Court's decision in that case was consistent with its determination that the Vienna Convention does not apply to Saab.  DE 197 at 10-13.  Although both Saab and the diplomat in *Abdulaziz* used the label "envoy," they are situated quite differently.  Most critically, in *Abdulaziz* the State Department certified the plaintiff's diplomatic status, a fact the Court relied upon as "generally . . . conclusive" with respect to diplomatic status.  *See Abdulaziz*, 741 F.2d at 1331.  A more apt comparison is *United States v. Sissoko*, 995 F. Supp. 1469 (S.D. Fla. 1997), where the district court concluded that a criminal defendant was not "entitled to full diplomatic immunity when such has not been conferred by the State Department" and found *Abdulaziz* not to be controlling because "[i]n that case the State Department certified the prince as a diplomat" but "no such certification [] occurred" in the case before it.  *Sissoko*, 995 F. Supp. at 1471.  Moreover, as a factual matter, the Court determined that the diplomat in *Abdaluziz* was

25

an "envoy" under Article 14 of the Vienna Convention. *Abdaluziz*, 741 F.2d at 1331. As explained above, the Vienna Convention applies only to members of permanent diplomatic missions, not members of special or temporary missions, like Saab claims to be.

## V. Saab Does Not Enjoy Transit Immunity Under Customary International Law.

Saab also argues that he is protected by the transit immunity provisions applicable to special missions under customary international law.  Br. at 48-52. However, even assuming that Saab was traveling as a "special envoy" as part of a special mission when he was detained in Cabo Verde, Saab does not enjoy transit immunity under customary international law.

To the extent Saab relies on the transit immunity provisions the United Nations Convention on Special Missions, Dec. 8, 1969, 1400 U.N.T.S. 231, *available at* https://legal.un.org/ilc/texts/instruments/english/conventions/9_3_1969.pdf ("Convention on Special Missions" or "New York Convention"), which covers short-term missions of diplomats, his argument fails because the Convention on Special Missions does not bind the United States and its transit immunity provisions do not "represent binding customary international law."  DE 197 at 13.  To the extent Saab relies on customary international law generally, his claim still fails because the transiting state, Cabo Verde, was not informed in advance of, and did not consent to, his transit

as required by customary international law.[10]  In either instance, even if Saab had a valid claim to transit immunity in Cabo Verde, which he does not, such claim could only apply to the jurisdiction of Cabo Verdean courts and would not apply to the jurisdiction of the United States.

A.  The transit immunity provisions of the Convention on Special Missions do not reflect customary international law.

Customary international law has been defined by this Court as "the 'general and consistent practice of states followed by them from a sense of legal obligation.'" *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1252 (11th Cir. 2012) (quoting Restatement (Third) of The Foreign Relations Law of the United States § 102(2)); *see also United States v. Macias*, 654 F. App'x 458, 460 n.3 (11th Cir. 2016) (per curiam) ("'Customary international law' is a term of art that refers to 'a general and consistent practice of states' that is followed out of 'a sense of legal obligation' pertaining to 'a matter of mutual legal concern.'").  "To qualify as customary international law, the practice must 'reflect wide acceptance among the states particularly involved in the relevant activity' and 'there must be a sense of legal obligation.'" *Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1237 (11th Cir. 2020).  "But where the customs and practices of States demonstrate that they do not universally follow a particular practice out of a sense of

---

[10] This inquiry is distinct from whether, as a factual matter, Iran had expressly consented to a special mission within the meaning of the Convention on Special Missions.  *See, e.g.*, Convention on Special Missions, Art. 2 ("A State may send a special mission to another State with the consent of the latter, previously obtained through the diplomatic or another agreed or mutually acceptable channel.").

legal obligation and mutual concern, that practice cannot give rise to a rule of customary international law." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 252 (2d Cir. 2003).

In his motion to dismiss filed in the district court, Saab primarily relied on the provisions of the Convention on Special Missions in support of his argument that he is entitled to transit immunity under customary international law. DE 147 at 22-23. To be sure, the Convention on Special Missions does address the immunities afforded to representatives of "special missions," which it defines as "a temporary mission, representing the State, which is sent by one State to another State with the consent of the latter for the purpose of dealing with it on specific questions or of performing in relation to it a specific task." Convention on Special Missions, Art. 1(a).[11] And Article 42 of the Convention on Special Missions does address "[t]ransit through the territory of a third state." *Id.*, Art. 42. The Convention on Special Missions conditions transit immunity on prior notice of, and a lack of objection to, transit by such third state. *Id.*

However, as the district court correctly found, DE 197 at 13-14, these provisions offer no protection to Saab for two reasons. *First*, as Saab himself acknowledged below, DE 147 at 23, the United States is not a party to the Convention on Special Missions; it is therefore not bound by its provisions. And *second*, not all the provisions of the

---

[11] Significantly, the Convention on Special Missions distinguishes a "special mission" from a "permanent diplomatic mission" which is defined as "a diplomatic mission within the meaning of the Vienna Convention on Diplomatic Relations." Convention on Special Missions, Art. 1(b).

Convention on Special Missions reflect customary international law.  *See Sissoko*, 995 F.

Supp. at 1471 ("The Court does not find that the U.N. Convention on Special Missions

is 'customary international law' that binds this Court.").[12]  That is particularly true of

the provision on transit immunity because, as the Government explained in the district

court, that provision was subject to significant disagreement during negotiations of the

Convention.  *See* DE 153 at 14-15.

> B. <u>Because Cabo Verde did not consent to Saab's transit, Saab is not entitled
> to transit immunity under customary international law.</u>

Perhaps recognizing that the Convention on Special Missions has no force of

law in the United States, Saab now stresses that he is protected by the transit immunity

protections reflected in customary international law generally.  Br. at 48-52.[13]  But, at a

minimum, transit immunity requires consent from the transiting state.  *See* Restatement

---

[12] The court in *Sissoko* found it particularly relevant that none of the members of the U.N. Security Council are parties to the Convention on Special Missions, leading the court to conclude that "there is, in the least, some resistance to the tenets of the convention such that it is not yet 'customary international law.'" *Sissoko*, 995 F. Supp. at 1471.  That remains the case today.  *See* Status of Convention on Special Missions, https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=III-9&chapter=3&clang=_en (last visited October 4, 2023).  Venezuela and Cabo Verde are also not parties to the Convention on Special Missions, although Iran is.  *Id.*

[13] In support of his argument, Saab interchanges precedents for permanent missions (*see e.g., Bergman v. De Sieyes*, 170 F.2d 360 (2d Cir. 1948)) and special missions (*see e.g., Weixum*, 568 F. Supp. 2d at 38).  As explained above, the Vienna Convention on Diplomatic Relations occupies the field with regard to transit immunity for permanent missions, but this regime is separate and distinct from that applicable to special missions.  Cases concerning permanent missions therefore have minimal value with regard to special missions.

(Second) of The Foreign Relations Law of the United States § 78(1) ("A person entitled to immunity from the exercise of jurisdiction by the receiving state as indicated in §§ 73 and 74, *who has been permitted* to pass through the territory of another state . . . is entitled to [transit immunity]") (emphasis added); *see also* DE 153 at 13-15.  And as the district court correctly concluded, Saab does not qualify for such protection under customary international law because Cabo Verde, the transiting state, did not consent to his transit. DE 197 at 14-15 (collecting authorities).[14]

Saab claims that the district court erred because its "principal reason for denying immunity was that, in its view, customary international law does not embrace '*transit-based* immunity.'"  Br. at 50.  That is a misreading of the district court's opinion.  In addressing Saab's argument based on customary international law, the district court first correctly rejected his claim that the Convention on Special Missions reflected customary international law.  *See* DE 197 at 13-14; *see also* Part V.A., *supra*.  It then noted that, aside from relying on one "intermediate appellate decision from the United Kingdom," in his

---

[14] To be sure, the Convention on Special Missions, for States parties to it, only requires that the transit State be "informed in advance, either in the visa application or by notification, of the transit of those persons as members of the special mission . . . and has raised no objection to it."  Convention on Special Missions, Art. 42(4).  Indeed, Saab concedes that the "Convention predicates *in transitu* immunity on prior notice and approval."  Br. at 52.  However, even if the Convention's provision on transit immunity did reflect customary international law, which it does not, Saab's claim would still fail, because Cabo Verde was not informed in advance of, and could not have provided its non-objection to, Saab's transit.  Cabo Verde submitted a Certificate of No Record for any notice by the Maduro regime of Saab's transit through Cabo Verde for his transit to Iran.  DE 193-5 (Gov't Ex. 4).

motion Saab "[did] little to discuss the parameters of transit immunity and fail[ed] to point the Court to any binding authority that recognizes its existence in the case of diplomatic agents serving temporary undertakings." DE 197 at 14. Far from holding that customary international law does not provide for transit immunity at all, what the district court actually held was that *assuming* "customary international law—independent of the [Convention on Special Missions]—somehow *did* recognize some form transit-based immunity for diplomatic agents on temporary missions, the weight of authority suggests that it would require the transiting state to proactively afford that immunity by consenting to it." DE 197 at 14. Thus, contrary to Saab's claim on appeal, the "principal reason," Br. at 50, the district court rejected Saab's claim of transit-based immunity under customary international law was that he had failed to satisfy one of its essential elements by proving that the transiting state—Cabo Verde—consented to his transit. DE 197 at 14-15. That holding is correct and should be affirmed.

The district court's finding that Cabo Verde did not provide advance consent for Saab's transit was confirmed by Cabo Verde's own judicial process. In rejecting Saab's challenge to his extradition to the United States, the Cabo Verdean Supreme Court of Justice found that "there is no evidence in the record to date that the State of Cabo Verde has consented to the Appellant's transit through its territory with the status of special envoy," and did not "recognize the status of Special Envoy to the Appellant," DE 193-1 at 33 (Gov't Ex. 1), Judgment No. 28/2021; *see also* DE 197 at 15 ("[T]he Supreme Court of Cape Verde explicitly found no evidence of Cape Verde's ever having

consented to Saab Moran's passage through its territory as a diplomatic agent."). The Cabo Verdean Constitutional Court found that the Supreme Court of Justice did not violate the Cabo Verdean Constitution in so ruling. DE 193-3 at 6 (Gov't Ex. 2); Ruling No. 39/2021.[15]

Moreover, a finding that Saab was entitled to transit immunity in Cabo Verde would, in essence, seek to invalidate the determination by the government of Cabo Verde, which was affirmed by the Cabo Verde courts, that Cabo Verde had no obligation under international law to afford Saab any form of transit immunity when it decided to extradite Saab. Under the act of state doctrine, U.S. courts are not permitted to second guess Cabo Verde's own determinations about whether Cabo Verde had any international obligations to afford immunity to Saab when it decided to extradite him. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964) ("The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory."); *see also United States v. Knowles*, 390 F. App'x 915, 928 (11th Cir. 2010) (per curiam) (holding that act of state doctrine prohibited the court "from evaluating the legitimacy of [the defendant's] extradition" because doing so

---

[15] That Saab received a passport visa in his personal passport from Cabo Verde, Br. at 52, does not mean that Cabo Verde consented to his transit as an alleged "special envoy" on a special mission from Venezuela to Iran.

would "hold[] that Bahamian authorities violated Bahamian law in authorizing [the defendant's] extradition").

Because transit immunity for a special mission under customary international law at a minimum requires the consent of the transiting state and because no such consent was given, Saab does not enjoy any transit immunity under customary international law.

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision of the district court.

Respectfully submitted,

MICHAEL DAVIS*
   First Assistant United States Attorney
   Southern District of Florida

ALEXANDER J. KRAMER
   Assistant Chief
   Fraud Section, Criminal Division

*Attorney for the United States, Acting under Authority Conferred by 28 U.S.C. § 515

NICOLE M. ARGENTIERI
   Acting Assistant Attorney General

LISA H. MILLER
   Deputy Assistant Attorney
   General

/s/ Jeremy R. Sanders
JEREMY R. SANDERS
   Appellate Counsel
   Fraud Section, Criminal Division
   U.S. Department of Justice
   1400 New York Avenue, N.W.
   Washington, DC 20005
   (202) 616-2650
   jeremy.sanders@usdoj.gov

33

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 8,880 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Garamond 14-point font in text and Garamond 14-point font in footnotes.

3.  This brief complies with the privacy redaction requirement of Fed. R. App. P 25(a) because it contains no personal data identifiers.

4.  The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk.

DATED: OCTOBER 4, 2023

/s/ *Jeremy R. Sanders*
Jeremy R. Sanders
Appellate Counsel
Fraud Section, Criminal Division
U.S. Department of Justice